The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Edward Garner, Jr. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; or amend the Opinion and Award.
* * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing as
STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. The Employer-Employee relationship existed between the Plaintiff and the Defendant-Employer.
3. The Travelers Insurance Company was the compensation carrier on the risk.
4. Plaintiff's average weekly wage was $292.50, which yields a compensation rate of $195.00 per week.
5. Plaintiff suffered an injury by accident on July 25, 1990, resulting in an injury to both legs.
6. The Defendant-Employer admitted liability and the parties entered into a Form 21 agreement which was approved by the Industrial Commission.
7. On May 29, 1994, Plaintiff committed suicide.
8. The issues to be determined by the Commission are whether Plaintiff's claim is compensable, and whether Plaintiff's wife is entitled to benefits pursuant to the Worker's Compensation Act.
* * * * * * * * * * *
The Full Commission adopts the findings of fact found by the Deputy Commissioner as follows:
FINDINGS OF FACT
1. On July 25, 1990, David D. Smith, while in the employment of the Defendant, Mecklenburg Paving, Inc., suffered an injury by accident when both of his legs were trapped within the grinder mechanism of an asphalt grinder. As a result of this incident, he underwent an unsuccessful below the knee amputation to his left leg on July 15, 1990. On July 27, 1990, he underwent an above the knee amputation to the same leg. Mr. Smith's injuries to his right leg included: a right open grade III femur fracture; circumferential degloving injury to his lower leg; and fracture and dislocation of his right foot. He endured multiple surgeries as a result of these injuries, including surgeries on July 25, 1990; July 27, 1990; August 6, 1990; August 27, 1990; September 5, 1990; April 13, 1991; March 3, 1992 and July 25, 1992.
2. Mr. Smith developed post traumatic stress disorder and major depression as a result of his injury on July 25, 1990, and was treated at Eastover Psychological and Psychiatric Group by Dr. Joseph Parisi, psychologist, and by Dr. Richard Gellar, psychiatrist, from January 4, 1993, through May 11, 1994. On May 29, 1994, Mr. Smith committed suicide by Amitriptyline overdose. Mr. Smith's death is attributable to his injury at work on July 25, 1990.
3. David and his wife, Elizabeth Smith, began living together in 1989 and continued together through the date of Mr. Smith's injury on July 25, 1990. They were married on January 16, 1991. Throughout the course of their relationship and marriage, Mrs. Smith was supported by her husband.
4. After his injury on July 25, 1990, Mr. Smith began experiencing emotional and psychological problems due to the trauma and pain caused by his injury at work. He had difficulty sleeping. He would see the machine when he closed his eyes and would relive the accident in his mind. Plaintiff experienced a great deal of pain as a result of his injury and the subsequent surgeries he endured. He became depressed and felt ashamed and embarrassed because of his injuries. He was greatly upset by his inability to work and be active and the amputation of his leg.
5. Prior to his injury and for a time after his injury, Mr. and Mrs. Smith had a good relationship. Their relationship deteriorated in September of 1993 when Mrs. Smith went to work. Mr. Smith became very jealous of his wife and began wrongly accusing her of having affairs. In the early spring of 1994, Mr. Smith's treatment of his wife became increasing abusive. He would yell at her and call her a "bitch". He began drinking 15 or 16 beers a day and on one occasion threw a TV remote control at her and pulled her hair. Mr. Smith had stopped drinking before his injury and had started again after his injury. He became increasingly angry and hostile toward his wife because of the pain he was experiencing and the frustrations he felt as a result of his injury at work. Mr. and Mrs. Smith also had sexual difficulties as a result of his injury on July 25, 1990.
6. Mrs. Smith left Mr. Smith in March of 1994 when Mr. Smith's treatment of her became intolerable. She was not having an adulterous affair. She and Mr. Smith continued to see one another after she left the marital residence. Their relationship improved once she removed herself from the residence. Mrs. Smith would visit Mr. Smith's home almost every day. She continued to assist him by going to the grocery store for him, taking him to pay his bills, and talking to him daily on the telephone. Mr. Smith continued to provide financial support to his wife during this time and paid her car insurance and a bill she owed for furniture.
7. Mrs. Smith justifiably removed herself from the marital residence in March of 1994. The couple did not enter into a separation agreement and were developing a closer relationship after their separation. The problems they were having in their marriage were directly related to the problems Mr. Smith was experiencing as a result of his compensable injury on July 25, 1990.
8. When Dr. Parisi, a psychologist, first saw Mr. Smith on January 4, 1993, Mr. Smith was having difficulty sleeping. He was also having intrusive memories of the incident and a heightened startle reflex.
Dr. Parisi stated of Mr. Smith:
 "It was very clear to me on each subsequent occasion when I met with him that being independent, doing everything he could on his own was very important for him. Now, he was also very frightened about having his benefits terminated prematurely by virtue of taking a job and no independence when it came to getting a job and for his fear then was that he would be cut off from benefits because he would have a job, he would then lose the job a couple of months later because he would not be able to perform satisfactorily due to the injury. Now that frightened him. But he had a very clear, very strong will and a desire to be as independent as he could."
9. Dr. Parisi explained that when he last saw Mr. Smith on May 11, 1994, "he discussed his concerns in detail and he spoke about whether he could simply sit at a desk for a full day without physical discomfort and he also spoke about practical matters that he thought would be problematic, in particular going to the bathroom. He mentioned for instance if he has to have a bowel movement, how at home he would have to lie down on the bed and take off his trousers or shorts and then get himself into the bathroom. There was no way he could do that in the bathroom itself. He was concerned what would happen if he was at work and he had to use the bathroom".
10. Dr. Parisi's diagnosis for Mr. Smith's condition was post-traumatic stress disorder and major depression. He opined that both of these conditions were caused by his accident at work on July 25, 1990.
11. On May 11, 1994, Mr. Smith had two concerns when he met with Dr. Parisi, one was anxiety about returning to work and his fears about being able to take care of practical matters such as going to the bathroom on the job and the fact that his wife had left him.
12. On May 11, 1994, Mr. Smith told Dr. Parisi that the reason his wife had left him was because he was not able to have a sexual relationship with her. Dr. Parisi stated Mr. Smith did not appear to be angry, but rather upset and depressed by his wife's leaving. Dr. Parisi stated,
 "He looked sad as he talked about it. He looked as though it was emotionally painful to him as to what had happened. Now, he also gave me the impression during that visit that he was recovering from it and that he was not having as much trouble as he initially had had right after she left, that he felt he was doing better."
13. Dr. Parisi stated on May 11, "the impression we had was he was adequately recovering from his wife having left him and that was why the focus was on his psychological readiness to return to work." He further stated that they still had a very good relationship; that she would help him do chores and assist him in other ways.
14. When asked if he thought Mr. Smith was suicidal on May 11, 1994, Dr. Parisi responds: "My impression when I met with him was that he was not suicidal on that particular date. Now, he did tell me that right after her leaving he did not care if he had lived or died and it was my impression that earlier on suicide might have been more of a concern for him but on that particular date I did not receive an impression that he was actively considering suicide."
15. Dr. Parisi goes on to explain: "I felt that many of his concerns at that point were job related. Again, he had told me that he felt he was overcoming the difficulties of his wife leaving, and I felt his apprehension about work was understandable and that if the insurance company could satisfactorily address those, then a lot of the current difficulties he was having would be taken care of."
16. Dr. Parisi, after reviewing Mr. Smith's suicide note, was asked his opinion as to whether or not Mr. Smith's suicide on May 29, 1994, was caused in whole or in part as a result of his injury at work on July 25, 1990. Dr. Parisi stated that in his opinion Mr. Smith's suicide was caused in part by the injury. He explains:
 "I think that his suicide was a combination of primarily two factors: one was the injury and subsequent physical difficulties he was having and the second factor was his wife having left him. I can only speculate but it would be my belief that either of those factors alone would probably not have been sufficient for his suicide and it was the two together." Dr. Parisi stated that in his opinion, even if Mr. Smith's wife had left, if he had not had the injury on July 25, 1990, he would most likely not have committed suicide."
17. When asked could or might Mr. Smith have been so deprived of normal judgment as a result of the compensable accident on July 25, 1990, that he was unable to control the impulse to kill himself, Dr Parisi responded, "I believe that he was still depressed at that point in time and that the depression was in all likelihood influencing his perception of events and his perception of what the future held for him. We do know that depression will have a very strong potential influence on a person's cognitions. So to answer your questions I'm sure that his mood was influencing his thoughts and his beliefs."
18. When asked would he agree that Mr. Smith's wife leaving him was the event that triggered his suicide, Dr. Parisi stated, "From the perspective that had she not left him would he be alive today, I believe he would be alive today, so one can say it clearly was that — of that event which was the precipitant but I would also reiterate what I said earlier. I think had he not had the injury and she had left, he would still be alive today. And I would like to add on other dimension to this since these things are never quite as simple as they first appear. On May 11, he was very concerned about the insurance company pushing him to go back to work and my note on February 11, 1993, I noted he said to me that he is experiencing the insurance company as being helpful and his fear of them pushing him hard to get a job subsided. . . . And my recollection at that point was that that was a tremendous relief form him, that he did not feel the insurance company was going to act in a detrimental or adversarial fashion to him. On May the 11th the fears had rearisen, and I think that also in combination with his wife having left him was still another dimension that he was struggling with."
19. Dr. Parisi, commenting on the significance of the suicide note, explained, "Again, I think when we do a psychological autopsy, we need to look at all aspects of a person's functioning — their physical well-being and their functioning, their psycological state. . . If in fact he was unable to be sexually active with his wife because of the injury, then his leaving her would be again more upsetting because potentially dating and not being able to be sexually active with any woman is going to be much more traumatic and the fact that he's left her and he's now disfigured because of his injury, the chances of finding another mate and his beliefs about finding another mate are going to be altered as if he didn't have the injury. So the injury again is super — excuse me. Her leaving him and what that would mean to him is superimposed on his self image and who he is now. They cannot in my opinion be separated."
20. The death of David Smith resulted proximately from his compensable injury and the depression and post-traumatic syndrome directly attributable to this injury.
* * * * * * * * * * *
Based on the findings of fact, the Full Commission affirms the holding of the Deputy Commissioner and enters the following:
CONCLUSIONS OF LAW
1. Where suicide is asserted as a defense, the burden of proof upon the party seeking to establish it. McGill v.Town of Lincolnton, 215 N.C. 752, 3 S.E.2d 324 (1939).
2. Although the act of suicide is generally one of self-motivation, it cannot be intentionally self-inflicted if the employee, because of mental condition resulting from the injury is unable to control the impulse to kill himself. Petty v.Associated Transport, 276 N.C. 417, 173 S.E.2d 321 (1970). Thus where the injuries suffered by the deceased resulted in the loss of normal judgment and he became dominated by a disturbance of the mind which was directly caused by his injury and its consequences, his subsequent suicide is not willful within the meaning of the Act. Petty v. Associated Transport, 276 N.C. 417, 173 S.E.2d 321
(1970); Thompson v. Lenoir Transfer Co., 48 N.C. App. 47,268 S.E.2d 534, Cert. denied, 301 N.C. 405, 273 S.E.2d 450 (1980).
3. As the decedent's widow, Plaintiff is entitled to these benefits under N.C. Gen. Stat. § 97-39. At the time of Mr. Smith's suicide, Plaintiff was married to David Smith. Widows who come within the definition of subsection (14) of N.C. Gen. Stat. § 97-2 are entitled to the presumption of dependency provided by N.C. Gen. Stat. § 97-39. Section 97-2(14) state the term "widow included only decedent's wife living with or dependent for support upon him at the time of his death; or living apart for justifiable cause or by reason of his desertion at such time." Mrs. Smith justifiably removed herself from the marital residence in March of 1994. The couple did not enter into a separation agreement and therefore plaintiff did not surrender all rights to look to the husband for support.
4. In the present case, it is clear that David Smith's suicide was proximately caused by his injury of May 29, 1994, and "but for" this injury and the subsequent depression and disability caused by this injury, Mr. Smith would not have taken his life.
5. In order to show proximate cause in North Carolina, the Plaintiff must show that a cause is a real cause, without which the injury would have not occurred. There may be more than one proximate cause of an injury. The evidence is clear that Mr. Smith's suicide was proximately caused by his injury on July 25, 1990. Furthermore, the separation of Mr. and Mrs. Smith was caused by problems the couple had as a result of his injury at work. Mr. Smith's overriding concern on May 11, 1994, when he was last seen by Dr. Parisi, was his perception that the insurance company was pushing him to go back to work and his concerns as to how he would be able to do this. In his suicide note to his wife, Mr. Smith expresses his love for his wife and his last wish is for her to receive his workers' compensation benefits.
* * * * * * * * * * *
Based upon the foregoing findings of fact and conclusions of law, the Full Commission affirms the holding of the Deputy Commissioner and enters the following:
AWARD
1. Defendants shall pay compensation to Elizabeth A. Smith, the widow of David Darrell Smith, compensation in the amount of $195.00 per week from the time of decedent's death and continuing for a period of 400 weeks. However, that portion which has accrued shall be paid to Elizabeth A. Smith in a lump sum subject to the attorneys' fee hereinafter approved.
2. Defendants shall pay funeral expenses not to exceed $2,000.00 to the Decedents' father who has paid the funeral expenses.
3. An attorneys' fee in the amount 25% of the award is hereby approved for Plaintiff's counsel. Said amount shall be deducted and shall be paid directly to Plaintiff's counsel.
4. Defendants shall pay the costs due the Commission.
FOR THE FULL COMMISSION
 S/ ___________________ COY M. VANCE COMMISSIONER
CONCURRING:
S/ ___________________ J. RANDOLPH WARD, JR. COMMISSIONER
S/ ___________________ DIANNE C. SELLERS COMMISSIONER
CMV/cnp/mj 9/3/96